James E. Goodley
GOODLEY MCCARTHY LLC
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 394-0541
*Additional Counsel Listed on Signature page*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELENA GOUDELIAS *individually and on behalf of others similarly situated*, | Case No.: |
| | **COMPLAINT – CLASS ACTION** |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| SECRIST MARKETING STRATEGIES, LLC, d/b/a BKA CONTENT, | |
| PHIL SECRIST, and | |
| CARA SECRIST | |
| Defendants. | |

Plaintiff Elena Goudelias ("Goudelias" or "Plaintiff"), through her undersigned counsel, individually and on behalf of all persons similarly situated, files this Class Action Complaint against Defendants Secrist Marketing Strategies, LLC, d/b/a BKA Content ("BKA"), Phillip Secrist ("Phil") and Cara Secrist ("Cara" and jointly with Phil, "Individual Defendants") (collectively, "Defendants"), seeking all available relief under the New York Labor Law, Art. 6 ("NYLL").

**JURISDICTION AND VENUE**

1. Jurisdiction over Plaintiff's claims is proper under The Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). There are in excess of 100 putative class members, Plaintiff is diverse from each of Defendants and there is more than $5,000,000 in controversy.

2. Venue in this Court is proper pursuant to 28 U.S.C. § 1391. The events giving rise to Plaintiff's claims occurred within this District, as Plaintiff worked for Defendants within this District. Further, Defendants conduct business in this District.

## PARTIES

3. Plaintiff Goudelias is an individual currently residing in New York, New York. She was employed by Defendant as a Content Writer and worked in the state of New York from on or about March 2019 through approximately March 2020.

4. Defendant BKA is a Utah limited liability company headquartered in North Ogden, Utah, and operating nationwide.

5. Defendant Phillip Secrist is an individual residing in North Ogden, Utah and the Chief Financial Officer of BKA.

6. Defendant Cara Secrist is an individual residing in North Ogden, Utah and the Managing Editor of BKA.

## CLASS DEFINITIONS

7. Plaintiff brings Counts I and II of this lawsuit pursuant to Fed. R. Civ. P. 23 as a class action on behalf of himself and the following opt-out class of litigants:

> All current or former Content Writers and Content Editors who performed work in New York for Secrist Marketing Strategies, LLC, d/b/a BKA Content within the past six years, who were classified as independent contractors (the "New York Class").

8. Plaintiff reserves the right to redefine the New York Class prior to notice or class certification, and thereafter, as necessary.

## FACTS

9. Defendant BKA is an online content production and marketing company. BKA describes itself as follows:

> We Write Content For Almost Every Industry
> Whether you're selling socks online, manufacturing bicycle parts, or running a law firm that needs content, we do it all!

https://www.bkacontent.com/all-industries/ (last accessed 10/4/2023).

10. On or about March 22, 2019, Plaintiff Goudelias signed an "Independent Contractor Agreement," **Ex. 1, ("IC Agreement")**, which to the extent lawful, governed the terms of the employment relationship between Goudelias and BKA.

11. From approximately March 2019 through approximately March 2020, Goudelias served as a Content Writer for BKA.

12. Plaintiff's IC Agreement obligated her "to create and deliver Content to BKA Content in accordance with the terms and conditions for Content provided by BKA Content. Such terms and conditions, including updates, will be made available by BKA Content in a manner determined by BKA Content. BKA Content has no obligation to accept or pay for any Content which does not satisfy all of the terms and conditions for Content." **IC Agreement at ¶ 2.**

13. The IC Agreement further states that, "this Agreement is personal to Independent Contractor and Independent Contractor may not assign any of his/her rights or delegate any of his/her duties under this Agreement without the prior written consent of BKA Content, which consent may be withheld for any reason in BKA Content's sole discretion. Any attempt to assign, transfer, or delegate any of Independent Contractor's rights, duties, or obligations under this Agreement or enter into any sub-agreement without such consent shall be void." **IC Agreement at ¶ 7.**

14. BKA also mandated that Content Writers and Content Editors sign a "Contractor Non-Compete Agreement," the terms of which stated that the "Contractor hereby agrees not to directly or indirectly compete with the business of the Company and its successors and assigns

during the period of contracted work and for a period of 1 year following the termination of the contract and notwithstanding the cause or reason for termination." **Ex. 2, Non-Compete Agreement.**

15. During all times relevant to this action, Defendant Cara served as BKA's "Managing Editor." Cara's role was to edit Content Writers' and Content Editor's work, as well as to supervise and manage Content Editors and create and enforce company policies relating to the writing and editorial process. Defendant Cara also had a role in hiring and promotion decisions.

16. During all times relevant to this action, Amber Morris served as BKA's "Hiring Manager." Morris' role was to review potential applicants for the positions of Content Writer and Content Editor and to make hiring decisions concerning the same.

17. During Plaintiff's employment, among other duties carried out in furtherance of her employment with BKA, Plaintiff regularly performed research for content pieces, wrote the pieces, spent time on Defendant's platform reviewing and selecting assignments, spent time in company training concerning company policies and procedures, and conferring with Defendant's Content Editors, Managing Editor and other leadership regarding edits to her work, and company policies and procedures.

18. While Content Writer, Goudelias regularly worked approximately 40–45 hours per week. Goudelias was typically paid only approximately $1,000 per month, at the rate of $0.015 per written word ($4.50 for a 300-word article). On an hourly basis, she was thus paid only approximately $5.17 to $5.81 per hour.

19. Plaintiff performed her work for BKA from her home in Manhattan, New York.

20. Plaintiff was paid via PayPal twice per month, and thus Plaintiff was on BKA's payroll.

## EMPLOYMENT RELATIONSHIP

21. The Second Circuit weighs several non-exclusive factors in order to determine whether, as a matter of "economic reality," an employment relationship exists. *See, e.g., Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir.1988):[1]

> 1) the degree of control exercised by the employer over the workers;
> 2) the workers' opportunity for profit or loss and their investment in the business;
> 3) the degree of skill and independent initiative required to perform the work;
> 4) the permanence or duration of the working relationship;
> 5) the extent to which the work is an integral part of the employer's business.

*Defendants Hired and Exercised Control Over Content Writers and Content Editors*

22. Defendants, per Hiring Manager Amber Morris, required Plaintiff to submit a writing sample to be considered for hiring by BKA. Upon review Plaintiff's writing sample, Morris, in conjunction with other BKA officials, made the decision to hire Plaintiff as a Content Writer at BKA.

23. Defendant Cara exercised final decision-making authority to hire/fire and/or promote Content Writers and Content Editors.

24. Defendants maintained control over the manner in which Content Writers and Content Editors performed their services. For example, Defendants set policies and procedures (including editorial policies), which they instructed Content Editors to follow. Defendants' policies and procedures related to the phrasing of articles, writing style, and related search-engine

---

[1] "Neither the New York Court of Appeals nor the Second Circuit has decided whether the tests for 'employer' status are the same under the FLSA and the NYLL. However, district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Vasto v. Credico (USA) LLC*, 2016 U.S. Dist. LEXIS 101875, at *14 (S.D.N.Y. Aug. 3, 2016) (quoting *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015)).

optimization best practices. Content Editors in turn would edit Content Writers' work according to Defendants' policies and procedures.

25. Defendants retained the right to edit the work product produced by Content Writers and Content Editors and also actually exercised such control.

26. Defendants prohibited Plaintiff, Content Writers and Content Editors from hiring their own staff or further assigning their work duties to anybody besides themselves:

> Independent Contractor agrees and acknowledges that this Agreement is being entered into with Independent Contractor because of the unique qualifications and attributes of Independent Contractor. **Accordingly, this Agreement is personal to Independent Contractor and Independent Contractor may not assign any of his/her rights or delegate any of his/her duties under this Agreement without the prior written consent of BKA Content, which consent may be withheld for any reason in BKA Content's sole discretion.** Any attempt to assign, transfer, or delegate any of Independent Contractor's rights, duties, or obligations under this Agreement or enter into any sub-agreement without such consent shall be void. This Agreement shall be binding upon all permitted successors and assigns.

**IC Agreement, ¶ 7 (emphasis added).**

27. For the purpose of maximizing Defendants' ad revenue, and despite the fact that Content Editors and Content Writers never shared in such revenue, Defendants regularly encouraged and pressured its Content Writer and Editors to meet and exceed content posting goals and requirements.

*Defendants Determined Content Writers' and Content Editors' Rate and Method of Payment; Content Writers' and Content Editors' Had Minimal Opportunity for Profit or Loss and Did Not Materially Invest in Defendants' Business*

28. In their employment with Defendants, Plaintiff, Content Writers and Content Editors possessed no significant opportunity for profit or for loss. Although under the IC Agreements, Plaintiff, Content Writers and Content Editors were paid on a per-article basis, such compensation structure is in the nature of a piece-rate wage, not a right to share in profits. See, e.g., 29 CFR § 778.111.

6

29.     Furthermore, under the Non-Compete Agreements, **Plaintiff, Content Writers and Content Editors were "not to directly or indirectly compete with the business of [BKA]** and its successors and assigns during the period of contracted work and for a period of 1 year following the termination of the contract and notwithstanding the cause or reason for termination." **The Non-Compete Agreements even forbid these workers from communicating with BKA's customers** – rendering any notion that Plaintiff, Content Writers and Content Editors were "freelancers" frivolous.

30.     Furthermore, all work product created by Plaintiff, Content Writers and Content Editors was assigned to BKA:

> Independent Contractor acknowledges and agrees that all Content is a proprietary work of BKA Content. To the extent permitted under applicable law, all Content shall be considered a Work Made for Hire (as such term is defined under the Copyright Act, 17 U.S.C. Section 101 and following, as amended) (a "Work Made for Hire") by Independent Contractor for BKA Content, and as such, shall be exclusively developed for the benefit of and owned by BKA Content. BKA Content shall exclusively own all copyrights and all other intellectual property rights in the Content.

**IC Agreement, ¶ 8(a).**

31.     Plaintiff, Content Writers and Content Editors were not required to invest in equipment or materials with respect to their employment at Defendants. Rather, these workers merely used their existing home computers and smart phones to perform services for Defendants.

*Content Writers' and Content Editors' Services Required*
*No Special Skill or Independent Initiative*

32.     Content Writers' and Content Editors' services required no special skill. For example, no specific academic qualifications were required to be a Content Writer or a Content Editor, much less a college degree. Similarly, no specific professional experience was required.

*Content Writers' and Content Editors' Employment Was
in the Nature of a Permanent Relationship*

33. Content Writers' and Content Editors' employment with Defendants was in the nature of a permanent relationship. Content Writers and Content Editors signed and labored under the terms of IC Agreements and regularly worked approximately 40-45 hours per week for Defendants.

*Content Writers' and Content Editors' Services Were
An Integral Part of Defendants' Business*

34. BKA is in the business of internet content creation and marketing. Defendants' very business could not exist without the content created by its Content Writers and Content Editors. Indeed, the content created by its writers and editors constitutes the entirety of the product offered by Defendants. Without the existence of the content published on BKA's client's websites, BKA would not have clients or a business at all.

35. As a matter of economic reality, Plaintiff, Content Writers and Content Editors were dependent on Defendants for continued employment and income, and therefore were employees of Defendants.

**Individual Liability – Phil Secrist**

36. At all relevant times, Phil was a principal of (CFO), and owned an interest in BKA.

37. Phil directed the work of Plaintiff, Content Writers and Content Editors at BKA.

38. Phil had the power to hire, fire and discipline Plaintiff, Content Writers and Content Editors at BKA.

39. Phil was responsible for classifying Content Writers and Content Editors at BKA as independent contractors, setting their compensation structure and rates, and thus, the decision to deny these workers minimum wages and overtime pay.

40. As described herein, Phil exercised discretionary control over payroll decisions with respect to Plaintiff, Content Writers and Content Editors. Thus, Phil was also an employer within the meaning of the NYLL.

### Individual Liability – Cara Secrist

41. At all relevant times, Cara was a principal of, and owned an interest in BKA.

42. Cara directed the work of Plaintiff, Content Writers and Content Editors at BKA.

43. Cara had the power to (and did) hire, fire, promote and discipline Content Writers and Content Editors at BKA.

44. As described herein, Cara exercised supervisory authority over Plaintiff, Content Writers and Content Editors. Furthermore, Cara also exercised discretionary control over payroll decisions with respect to Plaintiff, Content Writers and Content Editors. Thus, Cara was also an employer within the meaning of the NYLL.

### WILLFULNESS

45. In September 2017, Plaintiffs Cheryl Bradley and others filed an FLSA Collective Action with facts very similar to the instant case, *Bradley v. Vox Media, Inc*. (D.D.C. No. 17-1791) (the "*Bradley* Action"). The *Bradley* plaintiffs alleged that the defendant Vox Media had misclassified its Site Managers (who managed and produced content for sports websites in Vox Media's sports division "SB Nation") as independent contractors, in violation of the FLSA. The *Bradley* Action was widely reported in the sports and legal media.[2] Senior management of Defendants were aware of the *Bradley* Action since its inception.

---

[2] *See, e.g.*, "Centennial woman who ran Avalanche website sues Vox Media on claims that SB Nation broke labor laws," Denver Post, 9/2/2017, *available at*: https://www.denverpost.com/2017/09/02/cheryl-bradley-vox-media-lawsuit/ (last accessed 12/8/2022); "SB Nation Writers, Editors Win Class Status in Overtime Suit," Bloomberg Law, 3/7/2019.

46. On September 4, 2018, Judge Collyer denied Vox Media's partial motion to dismiss the *Bradley* plaintiffs' willfulness claims under the FLSA. *Bradley*, ECF Nos. 29, 30; *Bradley v. Vox Media, Inc.*, 320 F. Supp. 3d 178, 2018 WH Cases2d 317956 (D.D.C. 2018). Senior management of Defendants were aware of this opinion.

47. On March 6, 2019, Judge Collyer granted the *Bradley* plaintiffs' motion to conditionally certify a collective action of Site Managers under the FLSA. *Bradley*, ECF Nos. 36, 37; *Bradley v. Vox Media, Inc.*, No. 17-1791 (RMC), 2019 BL 75887 (D.D.C. Mar. 06, 2019). This too was reported in the legal media.[3] Senior management at Defendants were aware of this opinion.

48. As of approximately January 2020, BKA ceased employing Content Writers or Content Editors based out of California. This decision was based on the advice of BKA's counsel, in part due to California's adoption of the "ABC Test" for employment status in the *Dynamex* decision in 2018, *Dynamex Operations W. v. Superior Court*, 4 Cal.5th 903 (Cal. 2018), and the California's legislature later codification of this decision in AB-5. The propriety of classifying Content Writers and Content Editors as independent contractors under the Fair Labor Standards Act and similar state laws using the "economic realities test" as a yardstick for employment status was always, at best, dubious. Nevertheless, *Dynamex* undeniably placed Defendants on notice of the likelihood that their classification of Content Writers and Content Editors in other states (e.g., under the FLSA and economic realities test) was also problematic and likely illegal.

49. In June 2020, Plaintiff Brandon Carusillo, filed an FLSA Collective Action with facts very similar to the instant case and to *Bradley, Carusillo v. FanSided, Inc. et al.,* No. 20-cv-4766-JPO (S.D.N.Y.) (the "*Carusillo* Action"). Carusillo alleged that the Defendant FanSided had

---

[3] *Supra*, n. 4.

misclassified its Site Experts (who managed sports websites for FanSided's team site network) as independent contractors, in violation of the FLSA. Senior management of Defendants were aware of the *Carusillo* Action since its inception.

50. In September 2021, Judge Oetken denied FanSided's motion to dismiss the complaint and granted Plaintiffs' motion for conditional certification. *Carusillo v. FanSided, Inc.*, No. 20-CV-4766 (JPO), 2021 U.S. Dist. LEXIS 180014 (S.D.N.Y. Sep. 21, 2021). Senior executives at Defendants were aware of this opinion too.

51. Given Defendants' awareness of the *Bradley* and *Carusillo* litigation, of employment classification issues generally, and awareness resulting from the advice of counsel, Defendants knew it was illegal to classify Content Writers and Editors as independent contractors and to ensure they were paid minimum wages and overtime premium pay.

52. Despite its continuing knowledge of the illegality of its practices, Defendants willfully and continually refused to pay its Content Writers and Editors minimum and overtime wages due for overtime hours worked.

53. Defendants do not maintain accurate records of the actual hours that Content Writers and Editors worked each workday and the total hours worked each workweek as required by the NYLL.

54. Defendants knew that there was a substantial risk that Content Writers and Editors were employees and were not exempt from the NYLL's minimum wage and overtime requirements.

55. Defendants are a sophisticated nationwide marketing and media business worth millions of dollars. Defendants have access to knowledgeable human resource specialists and competent labor counsel.

56. Defendants have acted willfully and with reckless disregard of clearly applicable NYLL provisions by failing to compensate Content Writers and Editors with minimum wages and overtime premium pay of 150% of their regular rates of pay for overtime hours worked, as required by the NYLL.

## CLASS ACTION ALLEGATIONS

57. Plaintiff Goudelias seeks to proceed as a class action pursuant to Federal Rules of Civil Procedure Rule 23 on behalf of the New York Class.

58. The putative class is so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number would be based are within the sole custody and/or control of Defendant, upon information and belief, Defendant has employed more than one hundred (100) class members in New York during the Class Period.

59. Among the proposed class, common questions of law and fact exist as to all New York Class Members and predominate over any questions that affect only individual New York Class Members. Those common questions include, but are not limited to:

   a. Whether Defendants misclassified New York Class Members as independent contractors;

   b. Whether Defendants paid New York Class Members at least the minimum wage under New York law;

   c. Whether Defendants paid New York Class Members an overtime premium for all overtime hours worked;

   d. Whether Defendants issued New York Class Members at hire, written notices with the information required by NYLL § 195(1)(a); and

  e. Whether Defendants issued New York Class Members with each paycheck, an accurate statement conforming to the requirements of NYLL § 195(3).

60. Plaintiff Goudelias' claims are typical of those belonging to members of the New York Class in that: (1) Plaintiff Goudelias is a member of the New York Class; (2) Plaintiff Goudelias' claims arise from the same practice or course of conduct that forms the basis of the New York Class claims; (3) Plaintiff Goudelias' claims are based upon the same legal and remedial theories as those of the New York Class and involve similar factual circumstances; (4) there is no antagonism between the interests of Plaintiff Goudelias and absent New York Class Members; and (5) the injuries that Plaintiff Goudelias suffered are similar to the injuries that New York Class Members suffered.

61. Plaintiff Goudelias will fairly and adequately represent the New York Class.  There is no conflict between Plaintiff Goudelias' claims and those of other New York Class Members. Plaintiff Goudelias has retained counsel who are skilled and experienced in class actions and who will vigorously prosecute this litigation.

62. The New York Class is readily ascertainable from Defendant's own records.

63. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, the damages suffered by individual New York Class Members may be relatively small and the expense and burden make it impracticable for New York Class Members to individually seek redress.

64. Plaintiff Goudelias knows of no difficulty that might be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT I
### MINIMUM WAGES AND UNPAID OVERTIME, NYLL §§ 652, 663
### (Plaintiff Goudelias and the New York Class v. Defendants)

65. All previous paragraphs are incorporated as though fully set forth herein.

66. The New York Minimum Wage Act, NYLL §§ 652, sets the minimum wage in New York ranging from $9.70 per hour in the beginning of the New York Class Period (October 2017) up to $15.00 per hour, depending on the size of the employer and the County where the work was performed. Defendants are a "large employer" within the meaning of the NYLL.

67. The NYLL also empowers the New York State Commissioner of Labor to implement regulations entitling employees to overtime premium pay. *See generally Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337, 352-59 (E.D.N.Y. 2014). Pursuant to this authority, the Commissioner has enacted a regulation that mirrors the FLSA's mandate that employees receive overtime premium compensation calculated at 150% of their regular pay rate for each hour worked over 40 in a week. *See* 12 N.Y.C.R.R. § 142-2.2.

68. At all relevant times as alleged herein, Plaintiff Goudelias and New York Class Members were employed by Defendants within the meaning of NYLL § 651(5).

69. During all relevant times, Plaintiff Goudelias and New York Class Members were covered employees of Defendants, and as such were entitled to the above-described NYLL protections.

70. In violation of the NYLL, Defendants failed to compensate Plaintiff Goudelias and New York Class Members by at least the applicable state minimum wage and at 150% of their regular hourly rate (not to drop below the state minimum wage) for each hour worked over 40 in a workweek.

71. Pursuant to NYLL § 663(1), employers such as Defendants who fail to pay an employee wages in conformance with the NYLL shall be liable to the employee for all unpaid wages, liquidated damages equal to 100% of the unpaid wages, prejudgment interest, court costs, and attorney's fees incurred in recovering the unpaid wages.

## COUNT II
### WAGE NOTICE AND STATEMENT PENALTIES, NYLL § 198
**(Plaintiff Goudelias and the New York Class v. Defendants)**

72. All previous paragraphs are incorporated as though fully set forth herein.

73. NYLL § 195(1)(a) requires that at time of hire, employers provide their employees a written notice of the employee's "regular hourly rate and overtime rate of pay." *Id*. Defendants violated this requirement by failing to provide a notice with New York Class Members' minimum wage and correct regular hourly rate (not to drop below the state minimum wage).

74. NYLL § 195(3) requires that with each paycheck, employers provide employees with an accurate statement of "their regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." *Id*. Defendants violated this requirement by failing to provide in each New York Class Members' paystubs, the state minimum wage, as well as overtime premium where overtime was worked.

75. NYLL § 198 empowers employees to sue their employers for violations of NYLL § 195(1)(a) (up to a maximum of $5,000 per employee) and for violations of NYLL § 195(3) (up to a maximum of $5,000 per employee).

76. Plaintiff Goudelias seeks on behalf of herself and New York Class Members, the maximum allowed penalties, plus attorney fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief individually and on behalf of all others similarly situated:

a. An order permitting the New York Class to proceed in its claims as a class action under Fed. R. Civ. P. 23;

b. Back pay damages (including unpaid minimum wage and overtime compensation) and prejudgment interest to the fullest extent permitted under the law;

c. Liquidated damages and penalties to the fullest extent permitted under the law;

d. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

e. Such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all issues of fact.

Dated: October 11, 2023

Respectfully Submitted,

/s/ James E. Goodley
James E. Goodley (NY Reg. No. 5724083)
Ryan P. McCarthy*
GOODLEY MCCARTHY LLC
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 394-0541
james@gmlaborlaw.com
ryan@gmlaborlaw.com

*Attorneys for Plaintiff and the New York Class*

*\* Pro Hac Vice Application to be Filed*